Good morning. We have four appeals that are scheduled for argument this morning. I see that counsel are ready for the first case. It's the United States of America v. Lenard Roy Gibbs. David Chaykin is here for Gibbs, and Gabriel Adam Mendel is here for the government. And Mr. Chaykin, you may begin your argument. Thank you, Your Honor, for today's support. David Chaykin for Mr. Lenard Gibbs. Thank you for the opportunity to be heard today. Thank you for allowing Mr. Gibbs to participate by telephone in these proceedings. And thank you for the honor of this appointment to handle this case for the court. The investigation and trial of this case were riddled with serious errors that raised significant questions about whether Mr. Gibbs received a fair trial in the district court, ranging from unconstitutionally suggestive police questioning to blatantly invalid arrest warrants, police perjury, improperly admitted evidence, and unfairly prejudicial evidence about Mr. Gibbs' prior interactions with law enforcement. But given our very limited time today, I'd like to focus the court's attention on two issues in particular that we think warrant reversal here and time permitting a third issue. First, the district court failed to fulfill its gatekeeping duty under Daubert and the federal rules of evidence by admitting DNA evidence based on a mixed DNA sample that was of such a small volume that it violated the GBI Crime Lab's own standards and industry standards needed for reliable analysis and conclusions. Second, the district court conducted a flawed jury misconduct inquiry and failed to cure any prejudice when the jury foreperson used her outside expertise about the so-called CSI effect to try to sway the other jurors regarding the quantity and quality of the forensic evidence. Was that only related to counts five and six for which there was a mistrial? It's related to all of the counts, Your Honor. The DNA evidence in particular was extracted from a black long-sleeved T-shirt that was believed to have been worn by the robber. I'm talking about the CSI. Effect. Effect. No, Your Honor, we The juror who brought the book into the jury room, you said that was your, that was the issue that I'm asking you about. No, Your Honor, we believe that that issue impacts all of the counts and in particular But I thought that the discussion with the foreperson and the other individual jurors because the district court judge interviewed each one individually was that the textbook was brought in as a result of the impasse that was reached on counts five and six. We don't know that, Your Honor. The evidence in the record is that the jurors, when the foreperson introduced the concept of the CSI effect and tried to sway her fellow jurors, By the way, I know you keep calling it the so-called CSI effect, but I mean, there's articles and tons of information about the CSI effect. I mean, that's something that is common knowledge. I'm not sure that's in the record, Your Honor, but I don't necessarily disagree with you. But that's not an asset in the record, as I understand it. On June 12th, when the foreperson argued with her fellow jurors about the CSI effect, the only evidence in the record that we have is that the jurors sent a note through the foreperson that they were, what happens if we can't reach a verdict on one count? We don't know on June 12th what counts were at issue, whether any sort of verdict had been reached or partial verdict. And then the next data point we have is that on June 13th, after that juror had attempted to sway her other jurors with this outside influence, and after she had brought in the book, then there's a juror note that says we have reached a verdict on all but five and six, I believe. So the trial judge interviewed the foreperson of the jury and how many other members of the jury to determine whether or not this has had any effect on the jury? Your Honor, the trial judge interviewed all of the jurors, to my understanding. And this is an issue that we're reviewing for an abuse of discretion? Yes, Your Honor. Let me tell you the concern that I have about your case. You've got three co-defendants who identified your client as the robber of the loan max and the PNC Bank, Kari Campbell, Myles Butler, and Benita Alvarenga. And they all testified against him. In addition to Carla Cueto, the teller at Loan Max, then you've got Stacey Redwine, his girlfriend, testified. She called the tip line to turn him in. Then you've got Jason Griffith, his probation officer, who identified him by reviewing the bank surveillance video. So all told, there were five separate out-of-court identifications of your client as the robber. Then you've got the state's expert, who identified his DNA on the shirt. It seems to me if there was error with regard to any one of these six issues, the accumulation of all the other evidence is more than sufficient to say that the error was harmless. Respectively, Your Honor, please decree. First of all, the DNA evidence was invalid and should not have been admitted. And that was an abuse of discretion for the court to have admitted it. But you have, and you can answer Judge Wilson's question, but you also have not just DNA evidence. You have your client on video, and he was identified by the girlfriend in particular who called the tip line because she saw him on the video, on the TV. So the video, I'm sorry, what she saw on TV was a bolo. She did not identify the defendant committing the robbery. All she did was tell the police where her boyfriend lived because she saw from the TV that he was wanted. There's nothing in the record to suggest that she was turning him in for the robbery, thought he did the robbery, or identified him as the robber. But she's not the only one. I mean. So to address Your Honor's other questions. You've got three co-defendants who said he was the robber, and they all testified against him. So each of those cooperators was extremely damaged. And as the court may recall, Mr. Gibbs was not convicted on counts five and six even though there was one of the so-called cooperators who was implicating him in the robbery. Further, you have to look at each robbery separately and the evidence of each robbery because Mr. Gibbs received 25-year mandatory minimum stacked penalties for each of those robberies. So even if you think that the evidence is sufficient on one robbery, it matters that it wasn't on another robbery. And if the court notes the invalid and improperly admitted DNA evidence only related to the second robbery, the PNC Bank robbery, there were no fingerprints or DNA evidence associated with the Lone Max robbery. There were fingerprints that actually excluded Mr. Gibbs as the robber of the People's Bank. All these errors, do we review any of them de novo or do we review them all for an abuse of discretion? I believe they are all for an abuse of discretion, Your Honor. So as to the DNA evidence in particular, Your Honor, we think that as this court has held, DNA evidence is particularly powerful, and we think the improper admission of the DNA evidence in this case was extremely prejudicial and mandates reversal on its own. And essentially what the GBI Crime Lab did is introduce DNA evidence that did not, that was of a quantity that was too small to satisfy its own standards, its own threshold for admissibility and reliability. And as far as we are aware, it is not generally accepted in the scientific community at the level that it was at, which was .05 nanograms. Was the expert cross-examined? Yes, Your Honor. Let me ask you a quick question about the CSI effect that you had mentioned, the juror arguing with the other jurors about the CSI effect. Are you complaining about the fact that she argued about the CSI effect or that she brought the textbook in that nobody read? Both, Your Honor. So if no textbook had come in, you would be arguing that that was improper? Yes, Your Honor. But it's exacerbated by the fact that she brings in the book. And I would note for the court, one of the things the district court found was that no one other than the foreperson. I'm sort of perplexed by that argument because there's case law where you have prosecutors and defense attorney throughout the country who, during voir dire, talk about the CSI effect. And it is not considered something that's improper. That's not in the record of this case, Your Honor. I understand that, but you're making an argument. You're asking us to find that a foreperson talking about their common knowledge that they took in a class about the CSI effect is somehow reversible error. Well, I don't think it's common knowledge, Your Honor. I think it's expertise that she improperly introduced to the jury deliberations. And I would note, Your Honor, that this issue did come up with the trial judge and the defense attorney at the time stated that she would have objected. And I think any defense attorney would have objected to someone trying to raise that kind of argument in the courtroom. If the prosecutor had argued that, that would have been objectionable. And it arguably would have been something that should have been subject to proper Dauber analysis and admissibility determination under the federal rules. All right. Thank you, Mr. Chaykin. You have preserved some time for rebuttal. We'll hear from Mr. Mendell on behalf of the government. Thank you, Your Honor. May it please the Court, Gabriel Mendell for the investigation. I'd like to start with this DNA Dauber question. The minimum testable amount under GBI standards was not 0.2 nanograms. It was 0.015 nanograms, and the sample in this case was more than three times larger. That was established at the Daubert hearing, which is document 348, page 109 to 111, and 115 to 117, where it was explained that the 2017 study that Mr. Gibbs cites did not stand alone. That that study, which did test the smallest sample size being 0.2 nanograms, relied on their previous amplification process, which was called identifiler, with the smallest sample size they could amplify using that was 0.2 nanograms. But in 2017, they switched to a new process called global filer, and they did an additional validation of that process, which allowed them to find reproducible testable results as small as 0.015 nanograms. So the question was put to the expert at the Daubert hearing, did you use a sample that was not validated by your lab? Answer, we did not, we never would. All of these samples we run have been validated under multiple sets of conditions. That's document 349, page 135. And again, at trial, where the experts were subject to cross-examination, the question was, is there a prohibition in testing less than 0.2 nanograms? The answer was no. It would be less than 0.015 nanograms total. That's document 432 at page 71. So just on the facts, Mr. Gibbs is wrong. But of course, this is an abuse of discretion standard. It's not de novo. The district court conducted a two-day Daubert hearing, got dozens of binders filled with all these validations, and did not abuse its discretion in admitting this testimony. Turning to the question of extrinsic evidence before the jury, this is another area like Daubert where this court's precedent makes clear the deference owed to the district court is particularly large. Here, the district court, as soon as this issue was raised, conducted a thorough hearing, questioned each of the 12 jurors, discussed the issue with counsel, took a break, reviewed the relevant case law, and then made findings of fact consistent with this court's precedent in RONDA, which established that even if this mere presence of the textbook was extrinsic evidence, which the district court found it wasn't, there was no prejudice to the defendant. It was inconsequential. No one had opened it, read it, learned anything of substance. As the court's questions have indicated, the fact that the juror had brought this knowledge with her the day before was well within what this court has approvingly recognized as a juror's knowledge, observation, and experience in the affairs of life. What about the fact that the argument is being made that the textbook amplifies this knowledge? That if a juror had simply walked in and said, you know, I know about the CSI effect, that's different. But when a juror walks in with a textbook that says, even if nobody looks at it, says that it's the CSI effect is discussed in the textbook, doesn't that necessarily amplify the, what the juror has already said? That's right, Your Honor. So if we presume that that does constitute extrinsic evidence for the sake of this argument, then you look at what's the reasonable possibility of prejudice. And here the district court properly found, as in RONDA, that to the extent it was extrinsic, it was inconsequential. There was nothing of substance to it. There was no reason to think that this would have swayed any jurors. And that's supported by, when you look at the four factors, you also look at the strength of the government's case. And I don't need to repeat everything the court has already identified. We have the two paraphenics from the Lone Max and the PNC Bank robberies testify against him. We had him identified by a victim at the Lone Max robbery. His probation officer identifies him in the video of that robbery. You then have not only the DNA evidence with respect to the PNC Bank, but his cell phone, which the cell site data places at the bank at the time of the robbery, then following the path that he was chased by police and ending up where the tracker and the bag used to steal the money and the jeans worn by the robber are found the next day. So all of this points to showing there was no reasonable probability of prejudice. And then, of course, on top of that, we know after the fact that the fact that they reached a split verdict. This court's precedent is filled with cases saying that when you have a split verdict, that is evidence that the jury reached a reasoned conclusion. Was it a split verdict or five counts, five and six? I thought there was a mistrial. That's correct, Your Honor, but this court's precedent recognizes that as a split verdict where you are found guilty on four counts and there is a mistrial or they hang on two of the other counts. But he wasn't acquitted of counts five and six. I'm sorry, Your Honor. He wasn't acquitted of counts five and six. No, Your Honor. For example, in United States v. Dominguez from 2000, which is 226 Federal 3rd, 1235, it was the same fact pattern here. He was convicted of certain counts, the jury hung on the other counts, and this court found that that was a split verdict that gave evidence the jury reached a reasoned conclusion. What case was that, counsel? I'm sorry. It's United States v. Dominguez. It's 226 Federal 3rd, 1235, which is from 2000. And so that's simply in addition to the four factors in RONDA which show that the district court did not abuse its wide discretion. We can also take comfort from the split verdict to recognize that this court followed that abundant evidence that the court has hardly identified. If there are no further questions on those issues, I'm going to ask the court to affirm the convictions. Thank you. All right. Thank you, Mr. Mindell. Mr. Chaykin, you've reserved some time for rebuttal. Thank you, Your Honors. First of all, as to the issue of the quantity of the DNA genetic material, we've not seen that in the government's brief. This is the first time I'm hearing of this. But even if the government is correct in their citations to the record, that does not, still does not establish that testing low copy DNA samples, these low template DNA samples under 0.2 nanograms is generally accepted in the scientific community. And when I've researched the issue, the smallest that I can find that's generally accepted is 0.1 nanograms. As to the CSI effect jury misconduct inquiry, the government makes the point that this extrinsic influence was inconsequential to the jury deliberations. But I wanted to make a couple of points about that. First of all, I think it's very significant that the only counts at issue in the indictment that the jury hung on were the two counts for which there was no DNA or fingerprints, there was no forensic evidence. That highlights how important the issue of forensic evidence was to the jury and the whole point of why the foreperson brought this concept into the jury deliberations. The quality and quantity of the forensic evidence and the expectation by the jurors that there should be more of it was key and could not have been more crucial to what was happening. So I don't think it's correct to say that it was inconsequential. Finally, Your Honor, I would remind the court that it was the government's burden to rebut the showing of prejudice, not the defendant's. And we think what happened was essentially that the district judge conducted a very rudimentary inquiry. He did not inquire specifically of the foreperson, how it impacted her, and essentially excluded her in his analysis of determining whether it impacted any of the jurors. He said she's the only one who read the book. Well, she's one of the 12 jurors. It matters, and he did not issue any kind of corrective or remedial measures to make sure that Mr. Gibbs received a fair trial before an impartial jury. May I ask you a question? When you say that she read the book, is it your suggestion that she should have been excluded because she had read the book prior to serving on the jury or because she read the book afterwards? Afterwards, Your Honor. In my understanding, the record reflects that she looked at that session while during the course of the jury deliberations. Okay. All right. Thanks. The last thing I'll say, Your Honor, is I think the way that this played out in the district court was essentially that the judge validated. Rather than correcting what had happened, the judge essentially validated and endorsed what had happened and thereby endorsed this CSI effect theory that the foreperson had introduced by saying, okay, you jurors, don't concern yourselves with this. And I think the problem with that is it did not correct what had happened, and it basically left the jurors feeling that what they had done was correct and that this is a valid theory. Thank you very much, Your Honor. All right. We have your case, Mr. Chaykin. Thank you very much. And the court thanks you for your service. You were appointed. We thank you for your service. Thank you.